MRS. FRANK ANDREWS, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 46734.    Promulgated July 13, 1932.

*Walter E. Barton, Esq.,* and *J. L. Block, C. P. A.,* for the petitioner.

*Philip M. Clark, Esq.,* for the respondent.

644

OPINION.

MORRIS: The first two numbered issues herein really involve but one question, i. e., whether the petitioner is entitled to have her earned-income credit computed upon the maximum amount, $20,000, or the minimum amount, $5,000, of earned income, provided for in section 209 of the Revenue Act of 1926. The solution of this question depends upon whether one-half of her husband's "earned income" to which she became entitled under the community property laws of the State of Texas is "earned income" to her within the meaning of that section of the Act.

With due deference to the United States Circuit Court of Appeals, Fifth Circuit, which in *McLarry* v. *Commissioner*, 30 Fed. (2d) 789, reversed the decision of the Board in *Ethel Hopkins McLarry*, 8 B. T. A. 1257, upon the identical question involved in this proceeding, and after further consideration, we are of the opinion, for the reasons hereinafter set forth, some of which may not have been considered by that court, that the Board's decision in the *McLarry* case and its later decision in *Laura Rumsey McMicken*, 10 B. T. A. 302, correctly construe the taxing statute.

The Board in its opinion in the *McLarry* case said, speaking of the interest of a wife in the earnings of her husband in a community property jurisdiction, " Does it arise because the earnings are deemed by the law to be the product of their joint efforts or does it arise because of the marital status?," and it reached the conclusion, after a review and study of the decisions of the state courts of Texas, " that the interest of either spouse in the earnings of the other arises as a matter of law from the marital relationship," and not from " the existence of any joint effort." Although employing such considerations in support of the ultimate conclusion which it reached, the Board indicated that it entertained serious doubt that the question was dependent upon the decisions of the state courts. It said, however, " for the purposes of this opinion we have assumed that counsel for petitioner are correct in their contention that the decisions of the state court would be accepted as binding in determining whether or not the amount in question came to the wife as earnings from her services."

It is of interest to note that the circuit court in *McLarry* v. *Commissioner*, *supra*, did not base its conclusion on the premise that under the Texas law community income arises from joint effort. We deem it advisable, however, to consider what, if any, effect such an interpretation by the Texas courts would have in the determination of the present question, although we have heretofore reached the conclusion, after a consideration of the decisions of the Texas courts,

that the wife's interest in community income results from the marital relationship. It is the province of the state law to determine and define the property rights of its citizens, *DeVaughn* v. *Hutchinson*, 165 U. S. 566, and the Federal courts and this Board are governed thereby and will follow the state court's decisions pertaining thereto. See also *Warburton* v. *White*, 176 U. S. 484. In recognition of this principle the Congress recognized and the courts and this Board have repeatedly upheld the right of a wife in a community property jurisdiction, where there is a vested interest in community property as distinguished from a mere expectancy, to, and to be taxed upon, one-half of the income of her husband. *Poe* v. *Seaborn*, 282 U. S. 101, affecting spouses in the state of Washington; *Goodell* v. *Koch*, 282 U. S. 118, affecting spouses in the State of Arizona; *Hopkins* v. *Bacon*, 282 U. S. 122, affecting spouses in the State of Texas; and *United States* v. *Robbins*, 269 U. S. 315, affecting spouses in the State of California. But when it comes to the matter of determining how and at what rates that income, so acquired by the wife, shall be taxed by the Federal Government, whether as ordinary income, taxable at ordinary rates, or as earned income, enjoying a lower rate of tax, the laws of the states and the decisions of their courts are not binding. The Congress has defined the term "earned income" and, consequently, to attempt to interpret that definition by reference to the decisions of the state courts would establish a precedent by which each state might define certain classes of income as earned, contrary to the intention of Congress, and were we to follow those decisions it would result in a clear nullification of the definition laid down by Congress. Therefore, we are of the opinion that the decisions of the state courts, although they held that the wife's interest arises from joint effort, are not controlling in determining what constitutes "earned income" under the Federal revenue acts. See *Burk-Waggoner Oil Association* v. *Hopkins*, 269 U. S. 110. Theory must surrender to fact when the determination of the rate of the Federal tax is dependent upon a fact.

Section 209 (a) (1) of the Revenue Act of 1926 provides:

The term "earned income" means wages, salaries, professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income producing factors, a reasonable allowance as compensation for the personal services actually rendered by the taxpayer, not in excess of 20 per centum of his share of the net profits of such trade or business, shall be considered as earned income.

The Circuit Court, in reversing the *McLarry* case, used the following language:

\* \* \* Certainly it is not plain, from the language of the statute, that for an amount received as compensation for personal services actually rendered to be included in earned income such services must have been actually rendered by the taxpayer, who was entitled to that amount upon the receipt of it. As the amount returned by the petitioner as earned income was received as compensation for personal services actually rendered, it was within the language of the provision of the statute stating what "earned income" means, though such services were rendered by petitioner's husband and not by herself.

The court concluded by saying that the meaning of the applicable provision "is not free from doubt" and, therefore, it held that the income received by the wife by operation of the community property laws of the State of Texas was "earned income" to her, notwithstanding the income was earned by her husband and not by her.

We are mindful of the well established rule that in construing doubtful taxing statutes doubt must be resolved in favor of the taxpayer and against the Government (*Gould* v. *Gould*, 245 U. S. 151), but, when we attach due importance to the literal meaning of the words employed in the statute here, which is most important (*United States* v. *Merriam*, 263 U. S. 179), to the context and the purpose of the enactment of the provision, we think the basis for the application of the rule disappears.

We deduce from the circuit court's decision in the *McLarry* case that, had the Congress added in the first clause of the definition of "earned income" the words "by the taxpayer," thereby indicating a clearer intention to limit the section to the taxpayer who earned the income, its views would have coincided with those of the Board, but, because of the failure of Congress so to specify, it regarded the provision as doubtful, notwithstanding the language which immediately followed that clause expressly referring to the "taxpayer" in a manner clearly evidencing an intention to limit the income therein affected to that actually earned by such taxpayer. .

Even if the Congress had merely used the words "earned income," without definition, we would have been compelled to reach the same conclusion, in the absence of a clear intention on the part of the Congress to extend the privilege of the section to those receiving income "earned" by others. The dictionary definition of the word "earned" is to have merited or deserved "as by labor or service." To "earn" is "to acquire by labor, service, or performance; to deserve and receive as compensation or wages." Webster's New International Dictionary. "Earn means to gain as a just rate or recompense by service, labor, or exertion." *Dayton* v. *Ewart*, 72 Pac. 420. We know of no authority which classifies income which the wife receives from the husband, either by virtue of his willingness to give,

or by operation of law, as *earnings*. A statutory division of the husband's earnings with his wife in a community property jurisdiction can not and does not operate to make them her earnings as that word is defined and as it is commonly understood. The absence of labor or the performance of services therefor on the part of the wife deprives such property of all semblance of earnings. If this were not so, then all the wife's share of community income would be "earned" because of her household labors, irrespective of whether the source be stocks and bonds standing in the name of the husband, and acquired with his salary.

The Congress did not so limit its language, however, as just assumed, nor did it content itself with specifying that "personal services" should be "actually rendered" therefor in order to classify the income as "earned"—it added such descriptive words as "wages, salaries, and professional fees," which are generally and commonly understood by all to mean something which one receives for the performance of services. It also added that those wages, salaries, and fees must have been "received as compensation for personal services actually rendered," which, in our opinion, clearly indicates that there was no intention on the part of the Congress to extend the section to others than those who actually performed the services for which the compensation was received. The existence of a property right in the income in one who did not in fact perform the services, no matter upon what theory it arises, does not come within that intention. If the wife "received" the income by operation of the state statute, and not "as compensation for personal services actually rendered," the taxing statute has not been complied with.

We are of the opinion that any doubt that might exist as to whether the Congress intended that the income, in order to qualify as "earned," must have been earned by the taxpayer, is immediately dispelled by a study of the legislative history of the section as contained in the committee reports leading up to its enactment. It is clear that the provisions of section 209 were designed to aid the wage earner, as distinguished from what might be termed the capitalistic class whose incomes are derived from investments or from other sources than wages and salaries or compensation in some form. On page twenty of the report of the Committee on Ways and Means respecting the Revenue Bill of 1924, it is stated that the result sought to be attained by section 209 "is to give the *taxpayer* a credit of 25 per cent of the amount of the tax attributable to *his earned* income." The statute, therefore, in our opinion, was intended to cover "his earned income," that is, the taxpayer's, and not the income earned by another.

Allegation of error numbered three herein pertains to the respondent's finding that the petitioner received a taxable dividend of $1,000

from the Union National Bank in 1926, growing out of the organization of The Union National Company.

The petitioner contends that under the circumstances no part of the dividend became taxable to her in 1926. The respondent adopts a contrary view and he cites as authority for his position *Lonsdale* v. *Commissioner*, 32 Fed. (2d) 537; certiorari denied, 280 U. S. 575, affirming the opinion of the Board at 11 B. T. A. 659.

In that case the bank, as here, feeling that it should broaden its banking facilities, addressed a circular letter to its stockholders, as in this case, calling attention to the limitations of its powers as a national bank and informing them that the board of directors had formulated a plan for the creation of a new company whose charter would be broad enough to enable the company to supplement its banking facilities, the new company to be owned by the stockholders of the bank in proportion to their holdings in the bank itself. The plan there provided for the appointment of trustees and for such trustees holding the stock of the new company for the benefit of the subscribers, the beneficial interest in the stock of the new company to pass with the transfer of the stock in the bank, and, furthermore, that the directors of the bank " will declare a 10 per cent cash dividend, amounting to $1,000,000, and the stockholders will be asked to subscribe for stock in the new company in an amount equal to this dividend and authorize the committee to apply the proceeds in payment of their stock in the new company."

That case is concededly identical with the instant case except that here the plan called for the unanimous consent of the stockholders so to apply the dividend in advance of the dividend declaration, whereas, there, unanimous consent was not required in advance. The resolution of the board of directors stated " that each stockholder so minded may, with said dividend, cause the payment in full of his interest " in the new company. The petitioner there, being one of the assenting stockholders, contended that he was not entitled to cash under the dividend resolution and that he received no taxable income.

The petitioner contends that since the stockholders here had no other alternative than to have their dividends apply in the manner described, and since they could not have received any amount of the dividend optionally, as provided in the *Lonsdale* case, she was not taxable. With this we can not agree. We see no material distinction in principle between the two cases.

In both cases a dividend was declared upon the stock of the bank and in both cases the petitioners consented to the plan whereby their pro rata portion of the dividend should be applied to the purchase of capital stock of a distinctly different corporation. In decid-

ing that the dividend was taxable to the stockholder in the *Lonsdale* case, the court said:

Appellant received a distinct individual gain by the declaring of the dividend in question. The fact that he did not receive the cash in hand, but permitted the cash dividend thus declared to be used in the purchase of stock in another and distinct corporation, did not alter the substantial effect of the transaction; nor is it important that he could not presently sell and dispose of his stock in the new company, without at the same time selling his stock in the bank. Whenever such a disposition shall be made, there will be an increment of gain corresponding to the value of the new corporation stock which was purchased with the dividend declared. This dividend was segregated from the capital assets of the bank, and, when declared, was the property of the stockholder, and not of the bank. * * * The fact that appellant reinvested it in the stock of the new corporation, organized to do a distinct business which the bank was not authorized to do, renders that dividend no less an item of income. It is the inherent nature of the dividend itself that controls.

In the course of its discussion the court observed that "Any stockholder might, if so minded, have received his portion of the dividend in money, and have refused acceptance of the plan." In view of the broad principles laid down by the court, we are of the opinion that this language was *obiter dictum* and that it was not intended as a decisive factor in the conclusion which it reached. We believe that the court would have reached the same conclusion had the plan of payment been the same as here.

We are of the opinion that the distribution in question was taxable and that the respondent was correct in so holding.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

TRAMMELL, dissenting: I dissent, on the authority of *McLarry* v. *Commissioner*, 30 Fed. (2d) 789.

---

ARUNDELL, dissenting: I dissent on the first issue, not because of any conviction of error in the majority opinion, but solely by reason of the decision in *McLarry* v. *Commissioner*, 30 Fed. (2d) 789, decided by the Circuit Court of Appeals for the Fifth Circuit, to which an appeal lies in this proceeding.

---

LOVE, dissenting: I dissent from the prevailing opinion in this case on the first issue decided. My reasons for such dissent, stated as briefly as possible, are:

The wife's title to her half of the earned income is exactly the same as her husband's title is to his half. There is no law, rule or reason justifying the allowance of the maximum to the husband and denying the allowance to the wife.

Congress could have provided for only one such allowance or for a division between the husband and wife, as in the case of the deduction for the head of a family, but Congress did not do so, and it is not the province of any court or this Board to supply such legislation.